# Dauphin County Grand Jury Investigation Proceedings (No. 1).

Argued May 18, 1938.   Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Wm. A. Schnader,* for petitioners.

*Carl B. Shelley,* District Attorney, P. P., with him *Samuel Handler,* Assistant District Attorney, for District Attorney.

OPINION BY MR. CHIEF JUSTICE KEPHART, May 25, 1938:

On April 29, 1938, the District Attorney of Dauphin County, on the eve of a primary election, presented to the Court of Quarter Sessions of that county, a petition requesting that a special grand jury be convened to investigate charges made during the campaign against certain public officials and private individuals. The pe-

tition presented to the Court of Quarter Sessions, which was the basis of its action, will be found in the Reporter's Notes. The District Attorney did not personally, or through his office, make any investigation of the campaign charges, nor does he aver in his petition that he knew any of the charges to have a basis in fact. Whereupon the Governor of the Commonwealth and the Attorney General presented a petition to this Court in which it was averred that the effect of ordering the grand jury to investigate these combined charges would be to seriously interfere with and hamper the executive branch in its conduct of government, and that the charges were so vague and indefinite that an investigation predicated on them would enable the Grand Jury to pass upon not merely criminal violations, but the efficiency and regularity of the management of the entire executive department. It was also asserted that the Attorney General was the only official who could investigate these charges and that, under the Constitution and the law, a grand jury is not competent to investigate criminal charges aimed at the executive authority. Accordingly, a writ of prohibition was asked. On this petition we issued a rule to show cause and stayed proceedings until the further order of the Court.

The questions involved may be briefly stated to be: May the grand jury investigate the conduct of the executive branch of the State government? Are uninvestigated campaign charges (that is, uninvestigated by the District Attorney) a sufficient basis for convening a grand jury? May a grand jury be convened on a petition which does not charge the commission of any specific offenses, and does not allege the commission of any crime within the jurisdiction of the Dauphin County courts? Has the Attorney General exclusive authority to investigate the conduct of the executive branch of the government? Is the petition for a writ of prohibition premature because made prior to the charge of the court to the grand jury defining the scope of its investigation?

The Governor and the Attorney General are explicit in stating that they do not wish to save from prosecution any person who has been guilty of crime. They also assert that all charges will be speedily and fully investigated by them, and it was stated at the argument that the Attorney General has already taken up the investigation of the charges made and "to that end he has the full and unrestricted approval and consent of your petitioner, the Governor of the Commonwealth."

We recognize the strength of the language used in the Constitution, Article IV, Section 2, providing that the supreme executive power shall be vested in the Governor. We also recognize the effect of *Hartranft's Appeal*, 85 Pa. 433, that the official conduct of the executive branch of the government is not to be subjected to investigation by the judiciary. The mere fact a crime is charged in connection with, or as a result of, acts performed by the executive branch of government in its official capacity, is not sufficient to warrant the judiciary in undertaking to inquire broadly into the functioning of that branch. And, we may add, it is basic and fundamental in our system of government that the powers of the three coördinated branches of government are and should be separate and kept clear, the one from the other. The judicial branch cannot assume overlordship of the executive or legislative, or vice versa. In *Commonwealth v. Widovich*, 295 Pa. 311, at 322, it was stated: "The judiciary is a constituent or coördinate part of government; it is not subordinate to other powers, nor does it depend for existence on the legislative will. Its powers come directly from the people, without intervening agency. From the very nature of its time-honored powers, it should be kept a separate, distinct and independent entity in government to perform those duties which have been immemorially under the common law imposed on it. The domain of the judiciary is in the field of the administration of justice under the law; it interprets, construes and applies the law. Its powers

were possibly the first to be exercised by civilization. Within the compass of its duties it may ascertain and punish crimes against the State, and may, at times, in designated instances, operate as a check on other departments of government; but its strength and security come from a complete and absolute separation from political, administrative or ministerial functions. While in essence it may restrain attempts on the life of the State, and therefore under the common law may protect the State, the judiciary does not assume, nor should it be burdened with, those functions of government which are political, administrative or ministerial, nor does it intermeddle with the execution of these functions by the proper branches of government unless specifically required to do so by the Constitution. The legislative and executive branches should be, as they are, in a position actively to protect their delegated functions by the passage of an act like the one in question."

We have no disposition to minimize or enlarge the rule of *Hartranft's Appeal,* nor to enter into a field of conflict where judicial action would unlawfully disturb the conduct of government; this should never be done if the judiciary is to survive. But we do not understand from the petition presented by the Governor that he claims immunity from arrest, prosecution and punishment if he violates the criminal statutes. We do not understand that the Attorney General or counsel for petitioners, in presenting this petition, make any such claim. Everyone knows, or should know, that no citizen of our State or public officer is above the law. All may be punished for criminal violations. As to public officials, this is the plain mandate of our Constitution. Section 3 of Article VI, in dealing with impeachment, states: "The Governor and all other civil officers shall be liable to impeachment for any misdemeanor in office . . .; the person accused, whether convicted or acquitted, shall nevertheless *be liable to indictment, trial, judgment and punishment according to law."* If we were to hold that

the Governor and his official family were immune from criminal prosecution for any crime while in office, it would be possible for a corrupt government to bankrupt the State, and, when apprehended for trial, plead immunity. This never was the intention of the framers of our Constitution and we do not understand the Governor makes any such claim.

We agree with the contention, however, that the wholesale investigation of the vague and indefinite charges contained in the District Attorney's petition, in the form in which it is presented, would seriously obstruct the operation of the executive branch of the government. Here there are eight separate, distinct and unrelated charges involving different governmental agencies, all of which it is proposed to submit to unbounded investigation. This would lead to serious practical results. We do not hold that charges properly instituted, having as their purpose the development and exposure of a system of crime in office, cannot and should not be investigated by the grand jury under proper supervision. The immunity given the executive as to his official acts in *Hartranft's Appeal* would not protect those subordinate officials against whom accusations of indictable offenses are made by the District Attorney from such an investigation, any more than that case would protect the Governor himself from indictment for violations of the criminal law.

The Attorney General, the chief law officer of the State, with the wide powers he possesses, may, through the Quarter Sessions and the District Attorney's office, see to it that the proper administration of the government is not impeded in the course of an investigation by the wholesale removal of books, plans, specifications, and other documents absolutely essential to its functioning. The Superior Court, in an opinion by President Judge KELLER, has held that production of records and documents in the hands of the executive cannot be compelled where the executive officer in the exercise of

his discretion determines that such disclosure would be injurious to the public service, or opposed to the best interests of the State (*Marks's Appeal,* 121 Pa. Superior Ct. 181, 185) ; and see *Hartranft's Appeal,* at p. 447.

Though the Attorney General is given wide powers by the Administrative Code of April 9, 1929, P. L. 177, sections 904 and 908, to investigate any violation of the law within the executive branch, such powers do not exclude an investigation by the grand jury on charges properly presented. *An investigation which properly concerns itself with violations of the criminal laws* in matters incidental to the conduct of government, and does not merely inquire into the official acts of the governing power, as in the *Hartranft* case, is within the power of the grand jury. But the Attorney General, with his vast powers, recognized by this Court in *Commonwealth ex rel. v. Margiotti,* 325 Pa. 17, may supplement and supervise the grand jury in any investigation ; he may,—and it is his duty to do so if he believes the government is to be hindered in the lawful conduct of its affairs to the detriment of the security, peace and good order of the State,—supersede the District Attorney in the conduct of the entire investigation; or he may, if he believes better results will be obtained, act in conjunction with the District Attorney. We therefore conclude that the Attorney General's investigatorial powers may be supplementary to or merged with those of the grand jury, and may, if advisable, be coördinated in one investigation before the grand jury under his supervision.

The genesis of this call for the special grand jury was the petition or suggestion of the District Attorney. The rule of *McNair's Petition,* 324 Pa. 48, unanimously adopted by this Court, is this: To institute an investigation on such a suggestion the court must have knowledge or definite information from trustworthy sources that criminal acts forming a system of criminal violations of the law have been committed, "and at least one

or more cognate offenses should exist on which to base a general investigation." It was there stated at page 62: "There is no power to institute or prosecute an inquiry on chance or speculation that some crime may be discovered: *Re Morse,* 87 N. Y. Supp. 721. The grand jury must know what crimes it is to investigate. The court of quarter sessions has no power to set such an inquiry in motion unless it has reasonable cause to believe that an investigation will disclose some criminal misconduct which is within its jurisdiction to punish.

"The grand jury must not be set upon fruitless searches, founded upon mere rumor, suspicion or conjecture. These are proper matters for police investigation. Before reflection is cast upon the integrity of public officials a preliminary investigation by the forces of law charged with the discovery of crime should be made to determine whether there is any real foundation. Such jury investigations involve great expense to the public, subject the citizen to inconvenience and frequently interfere with the normal functioning of public officials and bodies brought before it. They throw a cloud of suspicion upon the parties subject to attack and undermine public confidence in them. There must be a sound, solid basis on which to proceed." See also *Commonwealth v. Hurd,* 177 Pa. 481; *Commonwealth v. Dietrich,* 7 Pa. Superior Ct. 515; *Commonwealth v. Klein,* 40 Pa. Superior Ct. 352; *Commonwealth v. Hackney,* 117 Pa. Superior Ct. 519. It is therefore necessary now to consider whether the information presented by the District Attorney warranted the action of the court in calling the special grand jury.

In *McNair's Petition,* we had before us the charge of the court; the basis of the present inquiry is the petition of the District Attorney and the judge's call indicating the scope of the investigation predicated on that petition. It is urged that this Court cannot pass upon the lawfulness of the investigation until the court below has given it in charge to the grand jury, because the

charge may limit and restrict the scope to matters less extensive than those outlined in the petition. It is sufficient answer to this contention to say that this proceeding was begun on the written suggestion of the District Attorney, and that the grand jury was called upon the information presented in his petition. If the petition does not present matters sufficient to justify the investigation, or disclose matters within the jurisdiction of the court, the call could not lawfully have been made. That is the only question before the Court. Furthermore, the court below convened the grand jury "to investigate and inquire into all matters set forth in the said petition, and any other matters which may properly come before it, *including the investigation of any other unlawful conduct on the part of any public official or person within the jurisdiction of this Court, . . .*" The call, in itself, is for an investigation more sweeping and unrestricted than the petition seeks.

We now come to the more serious portion of our inquiry, and that is the consideration of the specific charges that have been made in the District Attorney's petition. Generally speaking, and this observation applies to each and every one of the eight charges made in the petition, they are vague, uncertain and indefinite, and, as we stated above, an investigation based thereon, if permitted to be carried through as intended, would hinder the State government and possibly cripple its functioning. But charges properly instituted, in accordance with the essential requisites we have outlined and will discuss more fully, would safeguard the State's interests, and should cause no such hindrance. All of the charges in the petition are subject to fatal defects, now to be mentioned, and no indictment predicated on the petition could stand. There is not a single allegation in any of the eight charges of the time when, and the place where, the alleged violations of the law were committed. There is no suggestion that any one was committed within the jurisdiction of the Court of Quar-

ter Sessions of Dauphin County. While petitions of this character need not set forth in detail the evidence on which they rely, we stated in *McNair's Petition,* and we wish to reiterate it here, there must be at least one specific crime charged as part of a system of related crimes for the discovery of which it is necessary to have the grand jury's assistance. Each of these eight independent charges, covering as they do unrelated offenses, should be treated by separate investigations, though made by one grand jury, and each should set forth definitely one or more cognate crimes, with the parties thereto, forming part of a system of crime, on which to buttress the particular investigation. A grand jury should not be called to investigate one crime alone; that is for the police and magistrates. But, if the crime set forth is part of a system of crime, all may be investigated. As far as every one of these charges is concerned, it is admitted that, beyond the conference with the former Attorney General, the District Attorney has made no independent investigation whatsoever as to their truth.

Taking up these charges separately: Charge (a) deals with the payment of money to State cabinet officers and the Chairman of the Finance Committee of the Democratic State Committee, in return for their "influence" in causing certain legislation to be enacted by the General Assembly. The charge omits the essential designation of the time and place of the transactions to bring it within the jurisdiction of the Dauphin County court. The omission of the time at which they occurred is very important because, from the arguments presented, if there was a crime it would be barred by the statute of limitations. See *Commonwealth v. Bartilson,* 85 Pa. 482; *Commonwealth v. Werner,* 5 Pa. Superior Ct. 249; *Commonwealth v. Ruffner,* 28 Pa. 259, where indictments for crimes barred by the statute were held to be fatally defective. Furthermore, the acts here alleged did not constitute criminal offenses under any statute of the Commonwealth or at the common law. It is not

stated that the cabinet officers bribed, or improperly and unlawfully solicited or attempted to solicit, any members of the General Assembly, at Harrisburg or elsewhere, and we cannot infer that they did. No specific legislator is named to whom they talked or attempted to influence. There is no accusation that these persons in exercising their influence did so improperly or for corrupt purposes. None of the officers charged with these acts are members of the State Legislature. In other words, this accusation is broad enough to apply to any person, lawyer or another, who is paid a fee to address a legislative committee to influence it properly in passing certain legislation. The District Attorney states in his brief that it may not have been an indictable offense for representatives of brewery associations to pay money to these persons in return for their influence, but then attempts by inference to adduce certain criminal conduct which does not appear anywhere in the proceedings in this case. The charge as it stands does not set up an indictable offense.

Charge (b) concerns irregularities in the purchase of asphalt, trucks for highway use, and Kentucky rock, as appears in the appended petition. Again the charge does not specify the time or place where any of these alleged irregularities occurred. No specific criminal offense is charged. The District Attorney attempts to bring the transactions within the general conspiracy provision of Section 128 of the Act of March 31, 1860, P. L. 382. As the Administrative Code provides that all State purchases must be made through the Department of Property and Supplies, to make the conspiracy complete some individual connected with that department and who controlled these purchases should be implicated. No such official is named as being a party to these alleged transactions. No vendor is designated, nor information given of a single transaction in which anybody paid any money to the parties named. Moreover, such official purchases must be made according to

plans and standard specifications, with the consent of the Commissioners of Public Grounds and Buildings; bids must be taken and contracts awarded to the lowest bidders, yet there is not a specific allegation here that there was a violation of any one of these requirements. Not a single irregularity is mentioned. The law requires contracts to go to the lowest and best bidder. It should appear how or what sort of influence was to be asserted to corruptly solicit the officer and cheat the Commonwealth. The charge itself fails to allege a conspiracy, and it lacks the elements of the crime. See *Commonwealth v. Routley*, 318 Pa. 465. However that may be, if there is a specific accusation leveled at some officer of the government and some vendor of these materials and supplies, and persons are named to whom money passed for the purpose of corrupt solicitation to cheat and defraud the government, the door is open to investigate the charges arising therefrom. If one such specific offense within the jurisdiction of the court is set forth, with the essential allegations of fraud and corruption, and this is alleged as part of a system of crime committed or in the process of commission, such a foothold obtained would warrant a general investigation into the conduct of this department of the government in its purchases. But there should and must be a specific charge or charges, with all the elements stated above, to ground a grand jury investigation as decided in *McNair's Petition*.

Charge (c), relating to the improper use of highway equipment by State employees, likewise fails to set forth the time when the acts were committed, and the place. No single specific offense is laid. If one specific crime had been set forth as being within the County of Dauphin, this charge could be there investigated. It is fatally defective.

Paragraph (d) charges improper and unlawful relations between the General State Authority and one of its contractors. This charge was not made directly by

the former Attorney General, but evidently was taken from the newspapers or reported as hearsay by the former Attorney General. There was no investigation made as to its accuracy. There is no time or place fixed for the transactions in this charge and there is nothing to indicate that any of the supposed irregularties occurred in Dauphin County. The General State Authority operates throughout the State and there should have been a specific offense charged within the court's jurisdiction of some conspiracy by the contractor and the General State Authority to cheat and defraud the Commonwealth. Furthermore, before a grand jury could investigate this single crime it should be further averred, that it was part of a system of other criminal violations of the law to cheat and to defraud the State in Dauphin County, as relates to the contracts there being performed, and that the aid of the grand jury is necessary to expose these other related criminal acts. But, of a more important nature, here there is no allegation that the unlawful irregularities or relationships were criminal. Acts or work done under a contract may be contrary to the plans and specifications; it may be defective, irregular work, still such acts need not be criminal. The charge is fatally defective.

Charge (e) concerns the borrowing of money by the Governor. As it is presented there is no suggestion of criminal violation of the law, nor could there be under the circumstances related at argument. If the loan mentioned was made at the time there stated, the General State Authority did not then exist. The Act creating it had been declared unconstitutional. It is conceded that it is not unlawful for a public officer to borrow money from an individual, unless the loan when made definitely relates to and is proven to be connected with an unlawful solicitation to defraud the State. There is not the slightest allegation that anything like this occurred. We need not discuss the effect of the *Hartranft* case on this matter, as from the very

language of the allegation it affords no grounds for investigation. The District Attorney does not allege that the Governor unlawfully influenced or directed the award of contracts as a result of these advances. He does not even charge that anything improper was done; he merely states that the Mayor of Philadelphia wishes to know if there was any impropriety. No investigation could lawfully be predicated on such hearsay suspicion.

The charges of macing, coercion and the unlawful collection of assessments from public employees contained in paragraph (f) are not set forth with sufficient clarity to warrant any action by the grand jury. Not a single allegation of fact concerning these charges is presented. It is not stated who was the subject of the macing or coercion, nor who instigated and conducted it. The charges leave completely unanswered the question of where, in the length and breadth of the State, these acts occurred, and yet the answer to this question is determinative of the jurisdiction of the Dauphin County court. The petition as to these charges is fatally defective because under the law as it now exists no crime is charged. The charges were drawn with reference to the Acts of June 13, 1883, P. L. 96, and July 15, 1897, P. L. 275. These Acts definitely relate to elections and to campaign contributions, and are specifically and absolutely repealed by the Act of June 3, 1937, P. L. 1333, Section 1901, at P. L. 1508 and 1513. These Acts were highly important as a means of preventing forcible contributions from State employees for election purposes by political parties. Laws which regulate matters pertaining to, or incidental to, the conduct of elections, are election laws. See *In re Moskowitz*, 26 D. & C. 567. The title of the Act of 1937 is unquestionably broad enough to cover the repeal of these and any other Acts "relating to elections." Their repeal was deliberate and intended, and there is nothing in the new Election Code which provides a substitute for them, nor are there any offenses thereby created which approximate the charges in this

petition. Despite the fact that this may be regarded as most unfortunate for the State, it is the effect of the Act of 1937.

Paragraph (g) is a similar charge to paragraph (f) and is similarly defective for failing to allege time, place, or a single specific instance of the offense, and in failing to name any persons who were subjected to the improper conduct. These charges are also vitally affected by the repeal of the Acts of 1883 and 1897. It was stated at argument that these payments were in the form of campaign contributions. It is not unlawful in persons dealing with the State to make campaign contributions, and there is no charge of corrupt solicitation or conspiracy to cheat and defraud the State.

The final charge, contained in paragraph (h), is merely the statement by a public official that an investigation of "Capitol Hill" would disclose facts which would over-shadow and belittle a previous "graft scandal." This certainly requires no elaborate examination to disclose its vagueness and insufficiency. The District Attorney attempts no defense of this charge.

The court is not concerned with the circumstance that these charges were made in the heat of a primary campaign, nor with the question of whether or not they were made in good faith. Its sole concern is with the legal sufficiency of the petition to warrant a grand jury investigation of the executive branch of the government, which, at its origin, would have no proper bounds or scope. The course of such investigations must be clearly marked within the proper limits of the jurisdiction of the court. The crimes to be investigated must have been committed in the county where the investigation is held. The grand jury of course may indict any public officer or other person for any crime he is charged with having committed. To ground the inquiry there must not be the mere charge of crime by an individual, but there must be, in the opinion of the District Attorney and the court, evidence on hand of actual crime sufficient to

promise the assurance of one conviction for each of the particular offenses charged. There should be a sufficient number of instances of particular crimes within the system of crimes involved to warrant a general investigation, and the conditions should be such as to make it reasonably impossible to obtain evidence without the aid of the grand jury. Otherwise the Commonwealth would be exposed to the danger of the creation of a super-government by judicial inquisition.

Without more than appears in the petition of the District Attorney the call for an investigation by the grand jury in the present case was unwarranted in law. The return of the court below to the rule to show cause is therefore not sufficient to justify its action; the court not having certified that from definite knowledge gained from trustworthy sources it has received information of the character required to authorize the convening of the jury, a finding of criminal indictments as a result of this investigation would be open to grave attack. In conclusion, before the District Attorney or the court below again proceed to present or to order a grand jury investigation, we repeat there must be presented some credible evidence from a trustworthy source that a violation of the criminal law has taken place in each of the several charges contained in the District Attorney's petition. That credible evidence should be from some person who will testify that a criminal act or acts has been committed and that there are other similar acts which show a system of crime has been, or is, in the process of commission. The liberty and the reputations of our citizens should not be jeopardized by indiscreet and reckless charges.

The grand jury cannot be permitted to proceed under the present petition. Leave is granted to amend or supplement it within twenty (20) days in conformity with this opinion, and unless so amended the writ of prohibition will be directed to issue.

The District Attorney within the twenty days allotted by the Supreme Court filed an amended suggestion, the essential parts of which are found in .the Reporter's Notes, infra. The Governor of the Commonwealth of Pennsylvania filed answer thereto, the material parts of which are likewise to be found in the Reporter's Notes.

DISSENTING OPINION BY MR. JUSTICE MAXEY:

For the first time in the history of this Commonwealth, its governor has petitioned this court to prohibit an investigation of allegedly criminal acts and this court has issued a prohibiting order, saying: "The grand jury cannot proceed under the present petition." The petition referred to is that of the District Attorney of Dauphin County asking the Court of Quarter Sessions of that County to charge the grand jury to investigate charges of wrong-doing by public officials and by others. These charges were made by a man who until April 27th last had been for forty months Attorney General of this State. This request the three judges of that court, after due consideration, unanimously assented to, declaring in an official return to this court that the charges "amount to malfeasance in office, bribery and conspiracy to cheat and defraud the Commonwealth." These judges further averred that to stop this investigation "would be serious to the best interests of the state." In the face of this return, this court *has* stopped this investigation. It is true that the order filed says that "leave is granted to amend or supplement it [the district attorney's petition] within twenty days . . . and unless so amended the writ of prohibition will be directed to issue." Whether the petition can be amended so as to satisfy the requirements of the majority opinion, remains to be seen. The fact is that the proposed investigation is *stopped now* and a writ of prohibition *may* issue in twenty days. The order made by this court is, under

the facts stated, unprecedented, and any attempt to find warrant for it in either authority or reason is, in my judgment, a fruitless quest.

I consider the question raised by the Governor's petition, to prohibit the proposed grand jury investigation, one of the most important ever presented to this court in its 216 years of history. Since I am convinced that the decision of the majority is erroneous, my duty to dissent is clear. In 1923, the late ALEXANDER SIMPSON, then and for many years thereafter a member of this court, writing on "Dissenting Opinions" for the University of Pennsylvania Law Review, Vol. 71, page 205, at page 217, said: "If a judge is fully convinced, after a careful review of the matter, that the decision of the majority will wrongfully affect the citizens generally, or establish a precedent which will deprive other litigants of any of their constitutional, statutory or common law rights, he is not justified, even though he stands alone, in silently submitting to the opinion of his colleagues, however great they may be; for not infrequently by such insidious approaches great rights are minimized and finally destroyed." My view is that if the majority opinion is henceforth to be the law of this State, the immemorial rights of the people to have charges of wrong done to the body-politic by public officials and others, investigated by a grand jury, will in practical effect be minimized almost to the point of destruction.

The first errors in the majority opinion are found in that opinion's formulations of "the questions involved." It is there said: "The questions involved may be briefly stated to be: May the grand jury investigate the conduct of the executive branch of the State government? . . ." This question the majority opinion answers in the negative. My answer to the question thus posed by the majority is that the district attorney and the judges of Dauphin County *nowhere asserted* any intention to have investigated *the executive branch of the State government.* On the contrary, they proposed to have the

grand jury investigate, as they declared, *"unlawful* and *improper conduct* on the part of public officials and of others affecting the interests of the Commonwealth." An official's *unlawful* conduct cannot be his *official* conduct; when any official's conduct is unlawful *it ceases to be official.* If a chief executive of this State or Nation should, for example, commit a crime, that crime is his *private,* not his *official* act, and he is as much amenable to the criminal law for that crime as is the most obscure citizen of the land. In 1921 the then Governor of Illinois was tried in the criminal courts of his state on a charge of criminal conspiracy. The charge against him resulted from a grand jury investigation ordered by a local, or district court. See *People v. Small,* 319 Ill. 437. (In fairness it should be stated that no charges of criminal wrongdoing have been made against the Governor of *this* State. The charges of criminal wrongdoing are made against others.) Furthermore, some of the persons whose allegedly unlawful acts the District Attorney and Judges of Dauphin County proposed to have the grand jury investigate were not even in public office, but were private citizens who, it is claimed, had unlawful dealings with certain members of the governor's cabinet.

The majority opinion then says (referring to "questions involved") : "Are uninvestigated campaign charges (that is, uninvestigated by the District Attorney) a sufficient basis for convening a grand jury?" It answers the question thus posed, also in the negative. My answer to that question is that *it is the right* of a district attorney, if the district court consents, as it did here, to have a grand jury assist him in the investigation of allegations of criminal acts affecting the public and committed in whole or in part in his county. He is under no duty of *preliminarily* investigating these allegations, and, in fact, he has no *adequate* means of making such an investigation other than with a grand jury.

The majority opinion then says: "May a grand jury be convened on a petition which does not charge the commission of any specific offenses, and does not allege the commission of any crime within the jurisdiction of the Dauphin County courts?" My answer to that is that *no* law has ever required *anywhere,* as a prerequisite to a grand jury investigation, that a district attorney charge the commission of any specific criminal offense. The very purpose of a grand jury investigation is to determine *whether or not* criminal offenses have been committed. If a district attorney was already in possession of facts justifying *the charge* by him of criminal offenses, a grand jury investigation would be merely an expensive superfluity. The district attorney's petition *does* aver that "grave and serious charges have been made by Charles J. Margiotti [former Attorney General] and others concerning the conduct of certain public officials and others." Some of these charges he enumerates. The Court of Quarter Sessions of Dauphin County characterizes the acts publicly charged as, "if true, malfeasance in office, bribery and conspiracy to cheat and defraud the Commonwealth." What the three judges of Dauphin County think as to the substantiality of these charges is shown (1) by what they say in their official return to this court and (2) by the fact that they unanimously summoned the grand jury to investigate these charges.

My reply to the criticism in the majority opinion that the petition of the district attorney "does not allege the commission of any crime within the jurisdiction of the Dauphin County Court" is that this criticism is completely answered by that part of the return of the court of Quarter Sessions of Dauphin County which reads as follows: "This court . . . will limit the investigation to matters specifically within the jurisdiction of this court. The details of the charges as given to us clearly show a number of instances of violations of law within Dauphin County."

I also disagree with the majority opinion that the omission to charge the time when the alleged offense occurred is "very important." The investigation would disclose *when* the crimes, if any, were committed. If they were barred by the Statute of Limitations, the Court of Quarter Sessions would, of course, instruct the grand jury when their presentment was made that indictments should not be returned for offenses barred by the Statute of Limitations. I think if the crimes charged were committed, the grand jury of Dauphin County should *acquaint the people of this State with the facts,* whether convictions for the crimes were barred by the Statute of Limitations or not.

I also entirely disagree with the following statement contained in the majority opinion: "The wholesale investigation of the vague and indefinite charges contained in the District Attorney's petition, in the form in which it is presented would seriously obstruct the operation of the executive branch of the government." I do not, and the Judges of Dauphin County do not, regard the charges as "vague and indefinite," and the assertion, or at least implication, that an investigation of the serious charges presented by this record "would seriously obstruct the operation of the executive branch of the government is in itself a most damning indictment of the branch of government referred to. Before any government can in *any* of its branches be seriously obstructed by an investigation of wrong-doing in respect to that branch, the wrong-doing must have permeated that branch so thoroughly that to excise it or even to investigate it, would constitute a critical, if not fatal, major operation. If that is the situation in any branch of our State government, it is time that the citizens of this Commonwealth should become apprised of the fact.

I do not agree with the majority opinion that "the wholesale removal [to the grand jury room] of books, plans, specifications, and other documents absolutely essential to its [i. e., the grand jury's] functioning"

would have the "serious practical results" the majority opinion envisages. This investigation would be conducted under the supervision of the three admittedly competent judges of the Court of Quarter Sessions of Dauphin County, and they can be depended upon to see to it that the investigation will be conducted in such a manner as not to interfere with the normal functions of government. This State government survived without difficulty criminal proceedings in the Courts of Dauphin County a third of a century ago in which many official "books, plans and specifications and other documents" of the State government were produced in court in answer to the subpœna of the criminal court of Dauphin County.

The case of *McNair's Petition*, 324 Pa. 48, 187 A. 498, cited by the majority opinion as the only precedent for the issuance of a writ of prohibition, is easily distinguishable from the case at bar. As a writer in the Michigan Law Review, Vol. 35, p. 1020, aptly said: The *McNair Case* in Pennsylvania "may easily be explained as an attempt to order investigation of *non*-criminal matters." In that case, i. e., *McNair's Petition,* this court two years ago stopped a grand jury investigation ordered by a single one of the fifteen judges comprising the courts of Quarter Sessions of Allegheny County. The writ of prohibition was not issued until *after* the judge had charged the jury, and the *non-criminal nature of the subject matter of the inquiry was thereby made manifest.* In that case the district attorney admitted in this court, as recorded on page 63 of this court's opinion in that case, that "he expected to uncover *no* evidence of corruption." We held that "it was not the function of Judge SMITH . . . to supervise or criticize" the disposition by magistrates of certain minor cases. "The use of the grand jury as an inquisitorial body is to be limited," this court said, "to the investigation of criminal conduct and is not to be extended to the review of judicial discretion." This court also declared: "As it

was admitted there was no bad faith and the mistake was an error of judgment, neither the district attorney nor the grand jury under such conditions could impose criminal liability." The charges in the instant case which the Dauphin County Court judges ordered investigated cannot be designated as mere "errors of judgment." We have before us the petition of the District Attorney charging acts which, if true (as already noted) "amount [as the court below said] to malfeasance in office, bribery and conspiracy to cheat and defraud the Commonwealth."

I am convinced that the majority opinion is basically erroneous in laying down the requirement, as in practical effect it does, that a grand jury investigation cannot be ordered by a Court of Quarter Sessions unless "the time, place and specific instances of the offense" are all set forth in a district attorney's petition with substantially the same precision as an indictment. No such requirement has ever hitherto been laid down by any court in this Commonwealth. This basic error in the majority opinion becomes manifest when excerpts from that opinion are compared with the language of jurists whose opinions have been respected and followed for over a century. For example, the majority opinion says: "Its [the court's] sole concern is with the legal sufficiency of the petition to warrant a grand jury investigation of the executive branch of the government. . . . To ground the inquiry there must not be the mere charge of crime by an individual, but there must be, in the opinion of the District Attorney and the court, sufficient evidence on hand of actual crime upon which to find at least one conviction." Not a single case is cited for the novel proposition thus put forward in the majority opinion and I assert with confidence that no precedent for it can be found in the annals of any American or British court of justice. On the contrary, our courts have time and time again enunciated a doctrine exactly to the contrary.

Our highest courts have frequently said that the lower courts may *of their own motion,* i. e., *without any petition from anybody,* order investigations of criminal matters of general public import and that there are no limits to the inquiries of the grand jurors except their own diligence and the instructions of the particular court whose instrumentality they are. For example, one of the State's greatest judges, President Judge RICE of the Superior Court said in *Com. v. Klein,* 40 Pa. Superior Ct. 352, quoting from an earlier decision of a Pennsylvania court: "Criminal courts of their own motion call the attention of grand juries to and direct the investigation of matters of general public import, which, from their nature and operation in the entire community, justify such intervention." This principle was reiterated as recently as 1935 in *Com. v. Hackney,* 117 Pa. Superior Ct. 519. In *Frisbie v. U. S.,* 157 U. S. 160, the Supreme Court of the United States said: "In this country . . . [it] is for the grand jury to investigate any alleged crime, no matter how or by whom suggested to them, and after determining that the evidence is sufficient to justify putting the party suspected on trial, to direct the preparation of the formal charge or indictment." In *Com. v. Green,* 126 Pa. 531, 17 A. 878, the right of a grand jury "to act on matters given to them in charge by the court" is discussed and no limitation is placed on the court's action in entrusting grand juries with matters to investigate. James Wilson, a signer of both the Declaration of Independence and the Constitution of the United States and who was appointed to the United States Supreme Court by George Washington, said: "Grand juries are not appointed for the prosecutor or for the court; they are appointed for the government and for the people. The oath of a grand juryman—and his oath is the commission under which he acts—assigns no limits, except those marked by diligence itself, to the course of his inquiries. And shall the means and opportunities of inquiry be prohibited or

restrained?" His question implies that the correct answer was an emphatic "No." This language of Justice WILSON was quoted with approval by the Supreme Court of the United States in *Hale v. Henkel,* 201 U. S. 43.

In the frequently cited case of *Lloyd and Carpenter,* 3 Clark 188, President Judge KING of the courts of Philadelphia said in 1845: "Criminal courts of their own motion may call the attention of grand juries to and direct the investigation of matters of general public import, which, from their nature and operation in the entire community, justify such intervention." This opinion of Judge KING'S was cited with approval by this court in *Com. v. Hurd,* 177 Pa. 481, 35 A. 682, where this court upheld the action of the lower court in ruling that a grand jury investigation was the proper procedure "where the public, as a public, in contra-distinction from individuals who can do their own prosecuting are concerned." This court there held that a charge that certain county commissioners were unlawfully concerned in public contracts was a matter "of general public interest" which called for a grand jury investigation.

The court of any county is clothed with great power and charged with an important public trust. It must always be assumed, until proof to the contrary is shown, that a court in ordering an investigation of criminal charges is motivated only by a sense of public duty, and will see to it that the investigation is conducted fairly, impartially and without oppression. This court in *Rowand v. Com.,* 82 Pa. 405, in upholding the right of a district attorney to submit an indictment before a grand jury, without a previous commitment of an accused, said that "intelligence, integrity and independence always must be presumed to accompany high public trust."

The Supreme Court of Pennsylvania said sixty-two years ago in the case of *Rowand v. Com.,* supra: "The action of the officer [meaning the district attorney] and the court could be brought here for purposes of review only when their abuse of discretion should be found to

have been both manifest and flagrant." That has always been the settled law of this Commonwealth. In the instant case there has not been the *slightest* abuse of discretion either by the district attorney or the court, much less an abuse that is "manifest and flagrant." The Dauphin County Court had the right to direct this investigation either on its own initiative, or in response to a petition or a mere suggestion by the district attorney or by a suggestion or request from any other citizen. In view of the facts presented to the district attorney and the court, it was, in my judgment, not only their right but their imperative duty to *order* this investigation.

For the unprecedented act of asking that this investigation be stopped, there should logically be some extraordinary reason. What were the reasons invoked by the ingenuity of able counsel? An examination of them shows that none of these reasons have the slightest merit.

The one most strongly urged was (quoting from counsel's oral argument *and* brief) : *"It is beyond the power of the judiciary to investigate the conduct of the executive branch of the government."* In addition to what I have already said as to this proposition, I now point out that it possesses at least the novelty of being for the first time advanced in an American court of justice. Every department of government in this country is administered by individuals about whom no "divinity hedges," as divinity was once supposed to "hedge a king." When any of these individuals who administer any part of our government are charged with personal wrong-doing they are as much amenable to the criminal courts as are the humblest citizens of the land. In *Chisholm v. Georgia,* 2 Dallas 419, JOHN JAY, the first Chief Justice of the United States, said: "In Europe, the sovereignty is generally ascribed to the prince; here it rests with the people. . . . Our governors are [merely] the agents of the people." In the same case Justice JAMES WILSON quoted the following from Frederic the

Great: From courts "all men ought to obtain justice, since, in the estimation of justice, all men are equal, whether the prince complain of a peasant, or a peasant complain of the prince." As illustrative of the application of these sound principles, I cite the fact that within the last decade and a half three governors of American states have been called before the bar of criminal courts during their terms of office to defend themselves against charges of which they were accused.

Counsel for the petitioners cites *Hartranft's Appeal*, 85 Pa. 433. That case has no relevancy whatever to the issue here. In that case the Supreme Court refused to permit the Court of Quarter Sessions of Allegheny County to issue an attachment for contempt against the Governor and his Adjutant-General because they refused to appear before the grand jury of that county to testify in respect to riots which had taken place in Pittsburgh in July, 1877, and in the suppression of which by the National Guard under the command of the Governor, a number of soldiers and other persons were killed and wounded. The Governor and his Adjutant-General refused to appear to testify on the ground that they had no knowledge of the riots except what they had learned in their official capacities and they declared that "an examination into their acts in connection with said riots would be detrimental to the public service," that they were then "in constant correspondence with the army in the field in the riotous regions of the state, and in daily expectation of being required at the front, and to be called to a distant county would endanger the interests of the public service." This court held, *and this is all it held in that case,* (1) that the propriety of the governor's withholding the information (which obviously was *official* information) required by the grand jury was for the governor himself to determine, and (2) whether his duties at the seat of government at Harrisburg were such that at the time he was subpœnaed to appear in a distant part of the state, he could not without endanger-

ing the interest of the public service so appear and testify, was a matter for himself alone to determine. This court said: "Is obedience to a subpœna one of his [the governor's] duties, and if so, shall he discharge that duty in preference to that which rests upon him as commander-in-chief?" It decided that the governor himself must choose which of two mutually (at the time) interfering duties he should discharge. There is not in the opinion in that case even the slightest intimation that the executive department of the government could not be subjected to a grand jury investigation. *On the contrary,* this court said in its opinion in that case: "Neither is there any doubt about the power of the court to direct that body to make inquiry concerning affairs which directly affect the public peace and society." If in the *Hartranft Case,* the governor had tried, as here, to prohibit a grand jury investigation of alleged crimes committed by public officials and by others, because he, the governor, preferred to have the alleged crimes investigated by his subordinate, the Attorney General, we would have a state of facts exactly like the state of facts here, but *no such thing* occurred in the *Hartranft Case,* as any lawyer or layman can quickly determine by simply reading the report of that case. I again repeat: the stopping of this grand jury investigation is without precedent in the history of Pennsylvania. No other governor and no other person ever asked for any such thing and no other court ever granted any such thing. Many judges of state and nation have been investigated by a coördinate branch of the government, to wit, the legislature, and these investigations have sometimes resulted in the impeachment and removal of judges. No court ever granted a writ of prohibition to attempt to stop such an investigation.

Another proposition stoutly advanced by the petitioners is that since section 904 of the Administrative Code of 1929, P. L. 177, 238, gives the Department of Justice the power, and with the approval of the gover-

nor makes it its duty "to investigate any violations or alleged violations, of the laws of the Commonwealth which may come to its notice," counsel argues that the Attorney General's powers under the Code "are no less extensive in any county than those of a grand jury and they are not limited territorially as are the powers of a county grand jury." Because of the just cited provision of the Administrative Code, counsel for petitioners argues, quoting from Clause "C" of paragraph "28" of the Governor's petition for a writ of prohibition: "Under Section 13 of the Act of March 21, 1806, the powers conferred upon the Attorney General by the Administrative Code of 1929, have superseded the common law right of the grand jury to investigate violations of law in the conduct of the executive and administrative work of the state government." Section 13 of the Act of March 21, 1806, thus invoked, provides as follows: "That in all cases where a remedy is provided or duty enjoined, or any thing directed to be done by any act or acts of Assembly of this commonwealth, the directions of the said acts, shall be strictly pursued, and no penalty shall be inflicted or any thing done agreeably to the provisions of the common law, in such cases, further than shall be necessary for carrying such act or acts into effect."

The bold proposition thus advanced by the governor is that since the Attorney General can under the Act of 1929 (the Administrative Code) investigate law violations or alleged violations, a grand jury *nowhere* in the state can investigate any crime or alleged crime which the Attorney General sees fit to investigate. The absurdity of this proposition is so palpably obvious that no argumentative refutation is called for. No one ever attempted before to give any such interpretation to the above cited Act of 1806. That act simply means that where a statutory enactment *completely covers* a field formerly occupied by the common law, the common law procedure is ousted from that field. Section 904 of the Administrative Code of 1929 does not even purport to

cover the investigating field occupied for ages by grand juries. The Attorney General by the Act of 1929 is given a power to investigate alleged crimes, very much as policemen and detectives are given power to investigate alleged crimes. In furtherance of his investigation, he can also issue subpœnas, requiring the attendance of witnesses and the production of books and papers for examination. A fire marshal and each of his assistants in their investigation of fires have exactly the same power under section 8 of the Act of June 8, 1911, P. L. 705 (53 PS 3598), to compel the attendance of witnesses and the production of books and papers for examination, but no fire marshal or his assistant has as yet claimed that the investigating power conferred upon him ipso facto takes away all power of grand juries to investigate fires of suspicious origin. The fire marshal and his assistants cannot find presentments or return indictments. Neither can the Attorney General. Grand juries can. The field occupied by grand juries is no more invaded by the Administrative Code than it is by the fire marshal statute cited.

The quoted section of the Administrative Code was never intended to take from grand juries investigating powers. If the legislature attempted to take away such power from grand juries, it would find the Constitution standing immovably in its pathway. Section 1 of Article V of the Constitution vests the judicial power of the Commonwealth in the courts therein enumerated, among these courts enumerated are "courts of quarter sessions." An indispensable instrumentality of a court of quarter sessions is a grand jury, and our state legislature is powerless to take away or interfere with immemorial functions of a grand jury. No less an authority than Chief Justice JOHN MARSHALL said, in *United States v. Hill*, 1 Brock 156, Fed. Case No. 15364, that grand juries do not derive their powers from statutes but by implication from the constitution itself, that when courts are invested with criminal jurisdiction,

grand juries are "indispensable instrumentalities" of that jurisdiction, and that "grand juries are accessories to the criminal jurisdiction of a court, and they have power to act, and are bound to act, so far as they can aid that jurisdiction. Thus far, the power is implied, and is as legitimate as if expressly given." James Wilson, already referred to in this opinion, said of grand juries (Wilson's Works, Vol. 2, p. 214) : "All the operations of government, and of its ministers and officers, are within the compass of their view and research." I will not be a party to obstructing their view or prohibiting their research.

Having failed to advance any specific legal reason why this investigation should not proceed, the petitioners resort to the blanket allegation that the charges are too vague and general and ask: "Assuming all of these statements to be true, what crime was committed?" By "these statements" they refer to the former Attorney General's charges that $20,000 was paid certain political leaders for the enactment of certain legislation. If a price is being paid for the enactment of legislation at the State Capitol, citizens of the Commonwealth ought to know it and the obviously appropriate way to find out is through a grand jury investigation in the county where the seat of government is located, under the supervision of the Court of Quarter Sessions of that county, consisting of three judges known throughout the Commonwealth for their integrity, ability and impartiality.

Another charge made in this case was that "unlawful irregularities existed in the purchase of materials, equipment and supplies by the Commonwealth," that excessive prices were paid for these supplies, and that "certain sums of money" were paid to certain political leaders and others by the vendors of those materials "with intent to cheat and defraud the Commonwealth of Pennsylvania." The petitioners do not want that charge investigated because (so they say) it "does not specify the

time or the place when any of the alleged 'irregularities' occurred." If they did occur, it is obvious that a criminal conspiracy existed and it is a legitimate inference that some part of this conspiracy was carried out in the State Capitol where the Secretary of the Department of Supplies has his only office. If it occurred anywhere else, the grand jury can find out where it did occur and the matter can then be referred to the criminal court of the proper county. The judges of the courts of Dauphin County aver in their return: "The details of the charges as given to us clearly show a number of instances of violation of law within Dauphin County." The petitioners also say that "the charge, as made, is absurd on its face." This is not a very convincing statement. If the charge made is false, those charged ought to be eager to have its falsity proclaimed by a grand jury. As to the other charges, it is sufficient to say that the three judges and the District Attorney of Dauphin County all declared that they "amount to malfeasance in office, bribery and conspiracy to cheat and defraud the Commonwealth."

The grand jury investigation asked for (and now halted) is cavalierly referred to as a "fishing expedition." To "tag" any proposed grand jury investigation as a "fishing expedition" is not sufficient to destroy it or to impair its usefulness. All investigations are "fishing expeditions," and often the yield of "fish," big and small, is large enough to show that the expedition was fully justified. Neither in the piscatorial precepts of Izaak Walton nor in the fishing rules of this Commonwealth is there to be found any requirement that before citizens may lawfully fish in any waters they must furnish advance proof of the existence of fish in those particular waters and identify at least some of them. Any such foolish requirement would fatally cripple a time-honored and entirely legitimate industry. In a case decided five years ago *In Re Grand Jury Proceedings,* 4 Fed. Supp. 283, by the Federal District Court, sitting in Philadelphia, Judge KIRKPATRICK declared, after citing

a decision of the United States Supreme Court *(Hale v. Henkel*, 201 U. S. 43), that it was "settled beyond all question that in the federal courts an investigation by the grand jury need not be preceded by any definition whatever of the crimes to be investigated or the persons against whom an accusation is sought." In other words, no man has a right to demand a bill of particulars before he is investigated.

To hold, as does the majority opinion in practical effect, that a court cannot order a grand jury investigation unless the district attorney and judges specify in advance all the offenses and all the offenders they expect to uncover and all the convicting proof they possess, is exactly tantamount to a decision that grand jury investigations should be ordered only when they have no purpose to serve. What the majority now prescribe as *conditions precedent* to a grand jury investigation have been for ages the *fruits* of grand jury investigations. In *Hendricks v. United States*, 223 U. S. 178, 184, the Supreme Court of the United States said that the identity of the offender, and the precise nature of the offense, if there be one, normally are developed at the conclusion of the grand jury's labors, not at the beginning. The dictum which appears in a footnote on page 61 of the opinion in *McNair's Petition* (supra), that "in all cases where investigations have been ordered or refused, written formal charges have been made with a definite crime in evidence" and that "all concerned the criminal conduct of public officers," is simply *not the fact*. The writer of this opinion knows from his experience both as district attorney and as judge in a populous county and from his knowledge of the practice in other counties that grand jury investigations are usually ordered by the courts with*out* any written formal charges being first made, and the alleged criminal misconduct *both* of *public* officers and *private* citizens is *equally* subject to investigation. The object of such investigations is generally the uncovering of crimes

which *primarily injure the public at large.* Such is manifestly the object of the investigation the judges of Dauphin County ordered in the instant case. Whether the information which moved the judges of the court below to act came from "trustworthy sources," those judges were in better position than we are to determine. The very fact that the judges considered the information sufficiently trustworthy to justify a grand jury investigation, *should be conclusive,* as hitherto it always has been, on the question of the propriety of their act. This court said two years ago in *McNair's Petition* (supra): "Criminal acts which seriously affect or injure the public generally . . . require immediate attention so that these evils may be suppressed."

To halt the proposed investigation before the Court of Quarter Sessions of Dauphin County has charged the grand jury and thus acquainted the citizens of this Commonwealth further with the nature and seriousness of the disclosures which moved that court to action is, in my judgment, a grave mistake. To attempt to prevent an investigation of such charges as have been made in this case is as futile as an attempt to put a lid on a volcano. Innocent men have no reason to fear a grand jury investigation and when wrongfully accused they should demand it, as army officers, when wrongfully accused, demand a court of inquiry. The lid should be lifted and the light turned on. A great Pennsylvania judge in a memorable charge *(Addison Appeal,* page 47), said: "Grand juries are watchmen, stationed by the laws, to survey the conduct of their fellow citizens, and inquire where and by whom public authority has been violated, or our constitution or laws infringed." I would let the Dauphin County "watchmen" go to work *at once.*

The doctrine that "the king can do no wrong" has no counterpart in this country. Public officials are public servants, and "public office is a public trust," not a "private preserve." This investigation which the judges and

.district attorney of Dauphin County *pro*pose and which the governor *op*poses, *should go on.* If the Dauphin County grand jury is to be practically shorn by this court of its power to investigate fully the criminal charges appearing on this record, a new chapter is being written in the 216 years' history of this court and in the two and a half centuries' history of Pennsylvania. In that chapter I want this dissent recorded.

## AMENDED PETITION.

*Grand jury — Powers—Investigation—Initiation—Suggestion of district attorney — Sufficiency of allegations — Crimes charged — System of related crimes.*

Where the district attorney, within the time prescribed, filed an amended suggestion or petition which set forth a conspiracy which embraced several groups of crimes, allegedly occurring in the county within the statutory period, and further set forth each group separately, alleging as to each group an overt act as a part of the system of related crimes which it was necessary for the grand jury to investigate, and the suggestion definitely stated that the district attorney was in possession of evidence and trustworthy information obtained from reliable sources, showing that the matters alleged constituted a system of crime, and, attached to the suggestion, was the certification of the judges of the court of quarter sessions, stating that, having considered the amended and supplemental petitions that court was of opinion from the definite knowledge gained by it from trustworthy sources that the evidence was of such a character as to authorize the convening of the grand jury; and the governor filed an amended petition which contained a complete and specific denial for himself and the persons named in the suggestion, of all the criminal charges, and in which it was further stated that the district attorney's amendment was a deliberate attempt to perpetrate a fraud on the court of quarter sessions and the appellate court, made solely to meet technically the requirements of a valid petition, and that the charges were supported by "framed" or "manufactured" evidence; a writ of prohibition was refused and the amended petition or suggestion of the district attorney was returned to the court of quarter sessions for its action, as was also the governor's amended petition for a writ of prohibition, to be taken as an answer, for such consideration as that court might deem wise and just.

Mr. Justice BARNES filed a separate memorandum opinion.

## AMENDMENT OR SUPPLEMENT TO DISTRICT ATTORNEY'S PETITION.

The District Attorney averred that he had made diligent investigation within the limits of the facilities available to him and for a more complete and necessary enforcement of the criminal laws of the Commonwealth in Dauphin County he was in need of the assistance of a grand jury investigation; that he had competent and credible evidence showing that in the year 1935 at Harrisburg, Dauphin County, A, B, C, D and others unlawfully conspired to cheat and defraud the Commonwealth, to extort money and levy blackmail against employees, private citizens and persons doing business with the Commonwealth and its agencies; to extort money and levy blackmail from persons interested in the passage of certain legislation, to accept bribes, and to otherwise engage in unlawful and improper conduct including corrupt solicitation, misfeasance and malfeasance in office; that at the time of this unlawful conspiracy, A had been and still was Governor of the Commonwealth, B had been and still was a high state official and chairman of a political state committee, C during a portion of the period had held a high state office and therafter and still was the occupant of another important state office and secretary of a political state committee, and D had been and still was chairman of the finance committee of a political state committee; that the conspiracy continued during the years 1935, 1936, 1937 and 1938, and still existed within the County of Dauphin and elsewhere in the Commonwealth.

The District Attorney then averred particular illegal conspiracies or specific groups of crimes, all embraced within the general conspiracy first charged, setting forth each group separately, and averring in each case that the illegal agreement had been made or continued within two years last past, in Dauphin County, and charging an overt act or acts of conspiracy, extortion,

blackmail, bribery, as the charge might be, committed in Dauphin County, within two years last past, and as to each group alleging the overt act or acts as a part of the system of related crimes, which it was necessary for the grand jury to investigate.

The illegal conspiracies charged were as follows:

(a) A, B, C, D, and E, who had been and still was the Harrisburg resident secretary of a political state committee, and others, unlawfully conspired to extort money and levy blackmail from state, county, city and other public employees, by means of coercion, threats, intimidation and other unlawful methods, the nature of the unlawful conspiracy being such that each public employee was required to pay a specified percentage of his salary, depending upon the amount of the salary, and that the money collected by designated persons was distributed to specified political committees; (b) A, B, C, D and others unlawfully conspired to extort money and levy blackmail from architects, contractors and other persons doing business with the State, its agencies or other bodies politic or corporate, the nature of the conspiracies being that no architect would be appointed nor be given a contract with the State or its agencies unless his appointment was first approved by B and D, and until he agreed to pay to B, D and others, one-third of his commission; (c) A, B, C, D, and F, who had been and still was secretary to A, and G, who had been and still was a high state official, unlawfully conspired to cheat and defraud the Commonwealth by unlawfully awarding contracts for material and supplies to those who were not the lowest responsible bidders; (d) pursuant to the conspiracy, H, who had been and still was chief of a bureau in a state department, attempted to extort money and levy blackmail by demanding from a named person a specified sum for the approval by H, in his official capacity, of a certain mechanical device, H having acknowledged that the device was proper and entitled to his official approval, and because of the fail-

ure to make the payment the device had not been and was not approved; (e) D gave to A, then Governor of the Commonwealth and president of the General State Authority of the Commonwealth, specified large sums of money, in order to influence the award to D, or corporations in which he was interested, of contracts for the construction of buildings for the Authority within Dauphin County, and elsewhere, and in pursuance of this conspiracy contracts were fraudulently and dishonestly awarded by the Authority to D or corporations in which he was interested, said contracts having been based upon plans and specifications prepared with the approval of A in a fraudulent and dishonest manner so that favoritism and preference might be shown D in enabling D and the interested corporations to submit low bids for the contract, in that specifications were purposely drawn ambiguously in details and requirements to the end that contracts when awarded might be considered in favor of D, and for the purpose of stifling competitive bidding; and D was enabled, with the assistance of A, to have the plans and specifications prepared by persons who had been in the employ of D or corporations in which he was interested, and to secure the appointment of inspectors to inspect the work to be performed under the contracts, and that the inspectors and their superiors fraudulently and corruptly approved work performed under these contracts by A and the corporations, said work having been defectively performed and with inferior materials; (f) B, C, D, I and others, unlawfully conspired to extort money and levy blackmail from persons interested in the passage of legislation; and (g) A, B, C, D, and J, then a member of the Liquor Control Board and later chairman thereof, and K, who was appointed a member of the Liquor Control Board in 1937 and then joined the conspiracy, and others unlawfully conspired to extort money and levy blackmail from persons doing business with or selling spiritous and vinous liquors to the Pennsylvania Liquor

Control Board; in the year 1937, by requiring the vendors to pay to them large sums of money in consideration of the purchase of liquors from them by the Liquor Control Board and for other special considerations.

The District Attorney averred that from his investigation he was in possession of evidence and trustworthy information obtained from reliable sources showing that the matters alleged constitute a system of crime engaged in by public officials, and others, for the enrichment of themselves and political committees; that the evidence on hand was of such a nature as to give assurance of at least one conviction for each of the offenses charged; that without the assistance of the grand jury it would be impossible to procure a full and complete investigation, for the reason that much of the evidence and information was in the possession of and under the exclusive control of persons charged with the conspiracies, and their agents, and that information had been withheld from him and he had been hindered in making a complete and full investigation; that the criminal acts cited injure the public generally and, if permitted to continue, would endanger public safety and permit systematic depredations by public officials and others; and that the ordinary processes of law were inadequate to cope with and discover them.

### ANSWER OF GOVERNOR TO AMENDMENT TO DISTRICT ATTORNEY'S PETITION.

Before answering the specific averments contained in the amended suggestion of the District Attorney, the Governor emphatically denied each and every charge and implication of criminal or otherwise unlawful conduct made against him.

The Governor charged that the amendment to the District Attorney's petition was a deliberate attempt by the District Attorney to perpetrate a fraud upon the Court of Quarter Sessions of Dauphin County and upon the Supreme Court, by making unsupportable averments

solely for the purpose of meeting technically the requirements for a valid petition for a grand jury investigation.

The Governor further charged that the District Attorney's statement that he had competent and credible evidence was false; and that if the District Attorney had in his possession any purported evidence of the Governor's participation in any criminal conspiracy it was "framed" or manufactured evidence which could be supported only by perjured testimony.

The Governor requested the court to require the District Attorney forthwith publicly to reveal to the court any evidence which he might have in support of his averments, and that the grand jury investigation should not be authorized unless the District Attorney satisfied the court that his statement was correct.

The Governor further averred that the District Attorney was actuated by political and partisan motives; that the Governor did not oppose an investigation, under the direction of an impartial officer, of any bona fide charge of misconduct on the part of any officer or employee of, or person having business relations with, the state government, but on the contrary welcomed such investigation; he opposed any investigation under the direction of the District Attorney of Dauphin County for the reasons given.

OPINION BY MR. CHIEF JUSTICE KEPHART, June 20, 1938:

When the original petition for a writ of prohibition was filed by the Governor and Attorney General before this Court, we were impressed with the seriousness of the implications contained in the charges of the District Attorney, but as they were vague and indefinite we granted leave, as the law required us to do, to the District Attorney to file definite criminal charges against the parties involved if he had such criminal charges to present. The District Attorney some time afterwards did file an amended suggestion or petition for a grand

jury investigation. When a hearing was called to determine the sufficiency of this supplementary petition the Governor requested additional time to amend the application for a writ of prohibition. The time of hearing was extended and the Governor filed his answer and amendment.

We have now before us the amended suggestion of the District Attorney and the amended petition for a writ of prohibition. Considering first the amended suggestion, without going into detail, it charges, sufficiently under the Act of March 31, 1860, P. L. 382, section 128, as well as the common law, a conspiracy to cheat and defraud the Commonwealth, to extort money and levy blackmail, and to engage in corrupt solicitation, misfeasance and malfeasance in office. See *Wilson v. Commonwealth,* 96 Pa. 56; *Commonwealth v. Richardson,* 229 Pa. 609. This charge is so drawn as to embrace generally all of the matters referred to throughout the entire amended suggestion, and to include the several specific groups of crimes, allegedly occurring in Dauphin County within the statutory period. It further sets forth each group separately, charging overt acts of conspiracy, extortion, blackmail, bribery, as the charge may be, and as to each group it alleges an overt act as a part of the system of related crimes which it is necessary for the grand jury to investigate.

The suggestion definitely states that the District Attorney, from investigation by himself, his associates and subordinates, is in possession of evidence and trustworthy information obtained from reliable sources, showing that the matters alleged constitute a system of crime. Attached to this suggestion is the certification of the three judges of the Quarter Sessions Court stating that, having considered the amended and supplemental petition, that court is "of opinion from the definite knowledge gained by it from trustworthy sources, that the evidence is of such a character as to authorize the convening of the grand jury for the presentation of

that evidence to sustain the charges in said amended and supplemental petition. . . ."

The Governor's amended petition is a complete and specific denial, for himself and the persons named in the suggestion, of each and all criminal charges. He further states that the District Attorney's amendment is a deliberate attempt to perpetrate a fraud on the Court of Quarter Sessions and on this Court, made solely to meet technically the requirements of a valid petition, and that the intention is to engage in a "fishing expedition" of scandalous, libelous and false charges made during the recent primary campaign. The Governor's petition makes a direct charge against the District Attorney that his conduct is actuated by improper motives, reciting at length the basis for that charge. The District Attorney orally in open court denied these charges. The Governor's petition further states:

"I do not oppose the investigation, under the direction of an impartial officer, of any bona fide charge of misconduct on the part of any officer or employee of, or person having business relations with, the State Government. On the contrary I welcome and shall insist upon a thorough-going investigation of every charge made, with a complete report to the people of Pennsylvania, and the prosecution of every person against whom genuine evidence of criminality exists. I oppose and am resisting any investigation under the direction of the District Attorney of Dauphin County for the reasons I have given."

While we are all impressed with the sincerity of the Governor's statements, the only tribunal under the Constitution that can properly dispose of these issues of fact is the Court of Quarter Sessions of Dauphin County. We cannot invade its constitutional powers. This is true also as to the averment by the Governor that the charges are supported by "framed" or "manufactured" evidence. The same answer must be made to his request for the revelation of evidence.

There can be no doubt that the amended suggestion is within the scope of our prior opinion and conforms thereto, and therefore it is not within the power of this Court to restrain the action of the court below in conducting the grand jury investigation that it has ordered.

We may repeat, however, what we said before regarding interference by the judiciary with the executive branch of the government:

"We recognize the strength of the language used in the Constitution, Article IV, Section 2, providing that the supreme executive power shall be vested in the Governor . . . it is basic and fundamental in our system of government that the powers of the three coördinate branches of government are and should be separate and kept clear, the one from the other. The judicial branch cannot assume overlordship of the executive or legislative, or vice versa. . . .

"We have no disposition . . . to enter into a field of conflict where judicial action would unlawfully disturb the conduct of government; this should never be done if the judiciary is to survive. . . ."

We have full confidence in the judges of the Court of Quarter Sessions to observe the constitutional requirements and meet fully the judicial demands upon them.

The amended petition or suggestion of the District Attorney of Dauphin County will be returned to the Court of Quarter Sessions of Dauphin County for its action, as will also the Governor's amended petition for a writ of prohibition, which may be taken as an answer, for such consideration as that court deems wise and just.,

Rule discharged and writ of prohibition refused.

SEPARATE MEMORANDUM OPINION BY MR. JUSTICE BARNES:

The only question before this Court is whether the amended petition of the District Attorney of Dauphin

County for a Grand Jury investigation is in form sufficient to meet the requirements of such petition. The merits of the charges in the amended petition have not been considered or passed upon by this Court. The only justification that can be found for the proposed investigation is that it will be conducted in good faith for the sole purpose of bringing to justice persons guilty of violating the criminal laws of this Commonwealth. Certainly there can be no warrant in law for an intentionally protracted investigation by a Grand Jury, or one of such character as to constitute a judicial interference with the proper functioning of a coördinate branch of the state government, as indicated in the opinion of the Chief Justice heretofore filed in this proceeding. With the evidence which the District Attorney alleges already to be in his possession, I find it difficult to understand why he does not now cause warrants to be issued and to bring promptly to trial the persons against whom he alleges there is evidence of wrongdoing. It seems to me that this would be in the public interest, and at the same time would afford to the persons involved, if unjustly accused, their constitutional right to prove their innocence of the charges. For this reason I file this separate memorandum opinion.

## PETITION OF DAUPHIN COUNTY JUDGES.

*Courts—Judges—Petition to be relieved—Appointment of judge to preside specially.*

Where the judges of the court of quarter sessions of Dauphin County presented a petition requesting that another judge be assigned to conduct in that court all matters relating to the proposed grand jury investigation, alleging that the governor had impugned their judicial honor and integrity, charging them with being political-minded, with having accepted and certified the petitions of the district attorney for a grand jury investigation without study or analysis, and with having ignored the then existing grand jury and with having convened a new grand jury which had a high proportion of voters with a particular political affiliation, and that it appeared that the governor thought that any trials which might be the outcome of the grand jury investigation could

not be fairly conducted by them, under the circumstances, orders were made granting the petition and appointing a judge of another judicial district to preside over and take control of the proposed investigation in Dauphin County.

Judges HARGEST, FOX and WICKERSHAM, of the Dauphin County Court, petitioned the Supreme Court to relieve them from further participation in the proceedings and prayed that another judge be sent forthwith to take entire control over the grand jury investigation, if any.

PETITION OF JUDGES HARGEST, FOX AND WICKERSHAM.

The petitioners averred that the Governor, in a radio address, had impugned their judicial honor and integrity. The judges quoted from the address of the Governor, in which he charged them with being political-minded Republican judges, with having accepted and certified the petitions of the District Attorney for a grand jury investigation without study or analysis, and with ignoring the existing and available grand jury and convening a new grand jury which had a great proportion of registered Republicans to registered Democrats.

The petitioners averred that they had given the petitions of the District Attorney due consideration and had made careful inquiry, that they had convened a new grand jury because the then existing grand jury would have been able to sit only for a week in the new term and no investigation could have been properly conducted within that time, and that it had no knowledge of the political affiliations of the grand jurors. The judges stated that since it appeared that the Governor thought that any trial which might be the outcome of the grand jury investigation could not be fairly conducted by any of the judges of Dauphin County, unwarranted as such suspicion might be, they earnestly requested that the Supreme Court assign another judge to take entire con-

trol of the whole matter. The full text of the petition follows:

TO THE HONORABLE, THE JUDGES OF THE SUPREME COURT:

The petition of Wm. M. Hargest, Frank B. Wickersham and John E. Fox, Judges of the Twelfth Judicial District, constituting the county of Dauphin, respectfully represents:

In a radio address delivered Monday evening, June 13, 1938, while the question involved in this proceeding was still undetermined in the Supreme Court, the Governor of this Commonwealth, George H. Earle, III, impugned the judicial honor and integrity of your petitioners as judges. The Governor, among other things, in that radio address, referring to the petition first presented to us in this matter, said:

"The petition was presented to three highly political-minded Republican judges whom I have frequently been obliged to censure publicly for attempting to usurp the function of the Executive Branch and establish government by judicial injunction.

"The Republican judges immediately upon receipt of this petition, at once and without study, placed the seal of their court upon that document in testimony of its truthfulness and convened a Grand Jury.

"Their action was so high-handed, and so unprecedented, that the Pennsylvania Supreme Court called a halt and in a formal opinion publicly censured them for their unjudicial conduct. . . . I have the greatest respect for the judiciary, as does every citizen, but I cannot now stand idly by and permit the abuse of judicial processes by political-minded judges to destroy the Executive Branch of our government and injuriously affect the well-being of our people.

"When judges so far forget their oaths of office as to resort to actions to bring down upon them the censure

of the Supreme Court of Pennsylvania they cannot seek sanctuary behind their robes of office.

"One would suppose that such a rebuke from the high court would have been effective, but not with the Dauphin County Court. Last Friday, in another outrageous campaign maneuver by the Republican leadership and its man Friday—the Dauphin County District Attorney—an amended petition was submitted to the same judges.

"It was by far the most flagrantly political document ever filed in any court in all the history of the Commonwealth. . . .

"With this petition before it, the same Dauphin County Court which only a short time before had been censured by the State's highest court for its acceptance of the original petition, again without study or analysis, and within an hour after receiving the amended petition, had the unmitigated gall to certify that it had 'duly considered' such facts. . . .

"To hear the evidence gathered by these various lieutenants of the Republican organization, the Republican court ignored the Grand Jury then sitting, which contained seven registered Democratic jurors, and convened a new Grand Jury while the other was still available.

"By an almost unbelievable coincidence, only two of the twenty-three new jurors were registered Democrats, a ratio of eleven to one, although the registration ratio in Dauphin County between Republicans and Democrats is only 3 to 2.

"Also, by an astonishing coincidence, the twenty-one Republican jurors included two former State employees, one of whose dismissal papers I personally signed and whose attitude toward the State Administration as a result can better be imagined than described. . . .

"That investigation is a politically inspired inquisition, to be conducted by henchmen of the Republican State Committee, before a Republican dominated jury

answerable to a hostile Republican Court, on evidence gathered by a research man for the Republican machine.

"A Democratic State official coming before such a set-up would have absolutely no chance of fair play."

In the text furnished to the newspapers but omitted in the radio speech the following appears:

"I know that the people of Pennsylvania stand for fair play and decency. I know that every right thinking man and woman revolts at this attempted prostitution of our judicial process for political purposes."

The judges of Dauphin County have been justly proud of the fine record of the Court which they inherited and which they have most zealously striven to maintain. We think it hardly necessary to deny to the Supreme Court the unethical and untruthful statements made as above quoted as to the political-mindedness of the judges of the Dauphin County Court, because we think the Supreme Court is familiar with the fact that no politics has ever entered into the determination of any question in our Court.

As to the statement that the first and second petitions of the District Attorney were accepted by us "at once and without study," our return filed in your Court to the Rule granted on the first petition shows that we made careful inquiry and gave it due consideration; and as to the second, we emphatically deny the Governor's statement.

Our order on the original petition was made April 29, 1938. Under the Act of March 18, 1875, P. L. 28, if we had summoned the Grand Jury of the March Term then existing, that jury could have sat only one week into the June Term which began May 31, 1938, and in all probability no sufficient investigation could have been properly conducted within that time. Therefore, after careful consideration, we concluded that the June Grand Jury should, as provided by law, be summoned before the beginning of the term. As above quoted, the Governor has attempted to impute to us political considera-

tions by analyzing the political affiliations of the two grand juries. A Grand Jury and every jury is drawn, in this county, as every informed person knows, by the Sheriff and the Democratic and Republican Jury Commissioners acting together, in which the Court takes no part. It is hardly necessary to say that we did not know, and do not now know, anything about the political affiliations of these grand jurors; that we never knew anything about the political affiliations of any grand jury or any other jury and we, happily, are able to think that no other judge in this Commonwealth ever made an investigation to ascertain such a fact.

Through our years of service there have been a few instances where we learned that some humble litigant imagined that he might not get an impartial trial before one of us and uniformly, when such matter was made known to us, without weighing the vagaries of such imagination, we have seen to it that another judge was assigned in such a case. It now appears that the Governor of this Commonwealth thinks that any trials which might be the outcome of the Grand Jury Investigation could not be fairly conducted by any of the judges of Dauphin County, and therefore, unwarranted and unfounded as the suspicion is, we earnestly request that the Supreme Court at once assign another judge to take entire control of the whole matter, including the consideration of any preliminary questions; the charge of the Grand Jury if convened, and conduct the trials, if any, that may be necessary.

And we will ever pray.

 (Signed)  WM. M. HARGEST, P. J.
      FRANK B. WICKERSHAM, A. L. J.
      JOHN E. FOX, A. L. J.

## ORDER.

We have before us the petition of the Judges of the Court of Quarter Sessions of Dauphin County requesting that another judge be assigned to conduct in that

court all matters relating to the proposed grand jury investigation in Dauphin County. Under the circumstances presented to us by these three judges, we cannot deny their request. But in acceding to it we express our complete confidence in the integrity, ability, fairness and impartiality of these judges, and we are certain, had they remained in charge of these proceedings, they would have demeaned themselves and would have discharged the trust committed to their keeping in accordance with the highest and best judicial traditions of this Commonwealth.

AND NOW, June 20, 1938, petition granted.

PER CURIAM.

### ORDER.

AND NOW, to wit, June 20, 1938, the Honorable PAUL N. SCHAEFFER, President Judge of the Twenty-Third Judicial District, consisting of the County of Berks, is hereby directed to lay aside his judicial duties in that district and proceed forthwith to the Twelfth Judicial District, comprising the County of Dauphin, with Harrisburg as the County seat, there to preside over and take control of the proposed investigation by the June, 1938, Grand Jury of Dauphin County, including the consideration of any preliminary questions, the charge of the grand jury if convened, the conduct of trials, if any, and all matters in relation thereto. And, under this assignment, to have the same power and authority as is vested in the law judges of the Twelfth Judicial District by the laws of this Commonwealth.

Per Curiam,
JOHN W. KEPHART,
*Chief Justice.*